EXH. 13

IN THE U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SARAH JO PENDER, PLAINTIFF

v.                                    CAUSE: 1:11-CV-511-TWP-MJD

PETER PECKHAM, et al., DEFENDANTS

PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST INTERROGATORIES

NO. 1   Sarah Jo Pender                    D.O.B.  5/29/1979
2596 North Girls School Road              SS#: 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
Indianapolis, IN 46214

NO. 2   Other than the Defendants, the following persons witnessed, participated
in, or have knowledge of the events:

• KEN WILTSIE, INTERNAL AFFAIRS for INDIANA WOMEN'S PRISON
   Since 22 December 2008, Ken Wiltsie has been responsible for monitoring
me. He reads my mail, monitors phone calls, and many other things. He has
witnessed my changes in behavior throughout my 1,022 days in IWP SHU.
He met with me on 6 May 2010, four days after my initial psychotic
break. I asked him for help, and he spoke with Defendants about my mental
condition, the lack of out of cell hours, and in-cell activities.
   He told me on several occasions throughout my time in IWP SHU that
the Commissioner, Ed Buss, was responsible for keeping me in solitary
confinement and that different conditions of my confinement had to
be approved by "Downtown." According to him, my release is still
to be determined by the Commissioner's office.

EXH. 13                                                              13

**NO. 2 CONT'D**

• WILLARD PLANK, Internal Affairs Chief for the Indiana Dept. of Corrections

302 West Washington Street E334

Indianapolis, IN 46204

Willard Plank presided over investigating my escape case. On 30 December 2010, he told me that Commissioner Ed Buss was responsible for deciding my release from solitary confinement (SHU), and that once a new commissioner was appointed he would review my case. When I asked what he thought my chances of being released were, he responded that I would have a better shot at release, since a new commissioner would not "have an agenda" like Buss did, referring to the embarrassment of my escape/scandal on his first day in office.

• DR. JULIA HYLAND, Psychiatrist for IWP and Rockville Women's Prison
through Corizon Health (formerly CMS)

Contact through IWP Health Administrator, Ms. Murphy

I have been under Dr. Hyland's care since 8 May 2008. Dr. Hyland has attributed prolonged segregation as causing/exacerbating my mental illness. She has prescribed counseling and psychotropic medication to help alleviate some of my symptoms. (See medical records for details.)

• CAROL NAYLOR, MHP - Mental Health Professional for IWP through Corizon Health

2596 N. Girls School Rd.

Indpls, IN 46214

I have been seeing Ms. Naylor since December 2009 for regular segregation mental health evaluations and then for individual therapy since 4 September 2009. She saw me on 4 May 2011 and 5 May 2011 specifically discussing

2

Exh 13

NO, 2
CONT'D

the intense and sudden change in my mental state that occured on 2 May.
On 13 May 2010, during my monthly SHU classification review with Defendant
Shirley Washington, Peter Peckham and Vanessa Jolbert, Carol Naylor spoke to them
about her concern for my mental health. She expressed that it was caused by
excessive confinement and that I needed more out-of-cell hours and more
in-cell stimulation. She warned them of the negative effects of solitary
confinement on human mental health. She followed up repeatedly with
Defendants Washington, Peckham, and McCauley about her continued concern
for my mental health due to excessive solitary confinement in emails,
notes, staff meetings, and in person.

   She continues to provide individual therapy to me.


• ROLAND PENDER, Father of Plaintiff.

   13204 SE Newport Way, E102

   Bellevue, WA 98006

   425-679-6337


   Roland Pender spoke by telephone to Defendant Shirley Washington,
who told him that "downtown" (a common term used to refer to the IDOC
officials whose office is at 302 W. Washington Street, or the Commissioner's office.)
was responsible for releasing/retaining me in SHU. He also exchanged
letters with "downtown" officials, including Defendant Knight, who
said that the IWP Unit Team Staff – headed by Defendant Washington –
was responsible for the decision. When asked to clarify, Defendant
Knight avoided answering.

   (Affidavit and letters will be attached.)


3

Exh 13

**NO. 2** • BIRDIE JOHNSON. – Sgt. IWP. Former supervisor of SHU.
**CONT'D**

   Between December 2008 – March 2010, Sgt. Johnson observed and helped implement special conditions of my confinement in SHU, of which any change was either directed by or was required to be approved by "downtown." During this time, Sgt. Johnson was responsible for conducting most of my SHU classification reviews, during which she told me that she was not responsible for my release, that she did not know who was responsible, only that it was "much higher up" than her or anyone at IWP. She directed SHU before and after the mandatory lighting policy change, which she opposed.

   • DR. TANNER, General Physician through Corizon (formerly CMS) at IWP

   I was under Dr. Tanner's care from December 2008 – April 2011. On 23 March 2011, I complained of dizziness, hair loss, dry skin, fatigue, headaches, unexplained weight gain. After blood test results and a physical exam on 25 March 2011, Dr. Tanner determined that these symptoms were either due to side effects from my antidepressant medication, or otherwise "I think it's from a lot of time on lock." On 7 April 2011, I followed up with him and he said these symptoms were "caused by lock" and he recommended "as much fresh air, sunshine, water, and exercise as you can get."

   • DR. RAINS, General Physician (current) at IWP through Corizon

   I have been under his care for general health issues since June 2011. On 12 July 2011, I was seen for severe constipation, a side effect of the antidepressant I was on at the time as well as a symptom of what he called "rusting in segregation." On 9 September 2011, I was seen for a migraine and dizzy spells. Dr. Rains diagnosed me with orthostatic hypotension,

**4**

Exh 13

| NO.2 CONT'D | a symptom of prolonged segregation from lack of mobility. |
|---|---|

• MAGGIE BRYANT, IWP Counselor, former officer

Officer Bryant was a regular officer in IWP SHU from (estimated) September 2010 - April 2011, and was on duty and witnessed several of my panic attacks, mini-breakdowns, etc. She observed the changes in my behavior and ive spoke at length about my mental health.

• ALLEN ROME, IWP officer

Officer Rome was a regular officer in IWP SHU from (estimated) August 2010 - April 2011, and witnessed unusual behaviors, emotional breakdowns, severe mood swings, panic attacks, etc., and spoke to me at length about my mental health.

• ANNETTE PARKER, Sgt at IWP

Sgt. Parker has been a regular officer in IWP SHU since I arrived in December 2008. She has witnessed the changes in my behavior from an overall perspective. She was on duty, 2 May 2010, when I had what Dr. Hyland and Carol Naylor, MHP refer to as a psychotic or mental "break." She has also witnessed other unusual & emotional behavior.

| NO. 5 | Contained in Mental Health Records (release form completed) I do not have access to these at the time. |
|---|---|

5

Exh 13

NO. 6    2009

Around the beginning of March, I met with Defendants Peckham and McCauley. They gave me permission to have conversations with others (I had been prohibited from speaking to inmates or conversation with staff), and said that I would be able to have telephone access and no-contact visits after "downtown" approved them.

At the time, disciplinary sanctions had been reduced from a one year maximum down to 30 days in segregation, so the Defendants were reviewing each prisoner in SHU and releasing them one by one. Some of their SHU sanctions were reduced by six months to one or one year. I asked if my sanction would also be reduced and Peckham said that it wasn't impossible, but I shouldn't hold my breath.

I addressed my concern that I would not be released from SHU at the end of my one year sanction, on 21 December 2009, and that McCauley would hold me in SHU under administrative segregation. Defendant McCauley told me that he saw no reason why he would do that.

30 April 2009    I met with Defendants McCauley and O'Neal during a SHU classification review, along with SHU Supervisor Sgt. Birdie Johnson. During the meeting, I expressed my interest in developing a community garden for IWP that would be used for garden therapy and supply produce to local food banks. McCauley said that he would see about getting some flowers planted in the outdoor cage where SHU prisoners had recreation, and I could care for them. (That program was not implemented.) McCauley also told me that I would not be released that day, and gave me no specific reason. I did not question him.

21 December 2009   I did not meet with Defendants McCauley and O'Neal again until my SHU sanction was complete on 21 December 2009.

6

Exh 13

**NO. 6 CONT'D** McCauley said that although my behavior in SHU over the past year had been exemplary, he did not feel comfortable putting me in general population, because he didn't feel like there was enough security to properly monitor me. Instead, I would be staying in SHU under administrative segregation. When I questioned why he had told me in March that he saw no reason why he would place me under administrative segregation, he responded that circumstances had changed, but explained no more.

I asked McCauley to consider alternatives to simply locking me in a room, suggesting that I live on the unit for "special needs" and have no off-unit movement, or to have more movement on SHU. I told him about the mental health issues I was having.

31 December 2009 — SHU classification review with Defendant Washington. She asked a lot of questions about my escape and I answered freely. She blames me for manipulating an officer. Release denied. Approved by McCauley.

6 January 2010 — Met with Defendants Washington and Peckham. Release denied. No explanation. Approved by McCauley.

14 January 2010 — SHU classification review with Defendants Peckham and Washington. We spoke about lack of access to law library materials, adequate stamps and medicine. They said that programs were being developed. Release denied. No explanation. Approved by Defendants O'Neal and McCauley.

7    21 January 2010 — SHU classification review with Defendant Washington. Release denied. No explanation. Approved by O'Neal and McCauley.

Exh 13

**NO. 6.**
**CONT'D**

28 January 2010 - SHU classification review with Defendant Washington and Sgt Johnson. Release denied. No explanation. Approved by O'Neal and McCauley.

5 February 2010 - SHU classification review with Washington. Updated me on a visit application. Release denied. No explanation. Approved by O'Neal.

12 February 2010 - SHU classification review with Sgt Johnson. Release denied. Sgt Johnson said it was not her decision to make. Approved by O'Neal and McCauley.

18 February 2010 SHU classification review with Defendant Washington. Release denied. No explanation. Approved by Defendants O'Neal and McCauley.

25 February 2010 - " "

12 March 2010 - SHU classification review with Defendants Tolbert and Washington. Both tell me that this decision is not up to them. Release denied. No approval signatures on my copy.

23 April 2010 - SHU classification review with Defendants Tolbert and Washington. I addressed my concern about lack of adequate access to the telephone. Washington told me, "That's what you get for coming to prison." I addressed lack of adequate access to law library. Washington replied that it was "a stretch." (A new schedule was implemented) Release denied. No reason given. Approved by Defendants O'Neal and McCauley

13 May 2010 - SHU classification review with Defendants Tolbert, Washington, and Peckham. I cried throughout most of the meeting. Informed them of my mental health deterioration, and addressed lack of stimulation, both in-cell, and reduced out-of-cell hours. I requested their help. They called

8

Exh 13

**NO. 6 CONT'D**

Carol Naylor, MHP into the meeting and questioned her about my mental health and if I was being seen by her for these issues. Naylor told Defendants that she believed I had suffered from a psychotic-like break, and that I needed to be seen by Dr. Hyland, whom she had emailed, but that it would be faster if one of the Defendants filled out a staff mental health referral for me to be immediately seen. Defendants Peckham and Washington agreed to make a staff referral. Naylor told Defendants that my mental health issues were directly caused by too much isolation and not enough stimulation and that I needed out of my cell more and more things to do. Defendants showed no visible concern or alarm. Release denied. No explanation given. Approved by O'Neal and McCauley.

26 May 2010 - SHU classification review with Defendants Washington and Tolbert. Washington brought up my mental health and seemed genuinely concerned. Neither she nor Peckham sent a staff referral to Dr. Hyland. I conveyed my experiences to Tolbert and Washington. They said that they would work on programming for SHU and activities for me to do while in my cell. Release denied. No reasons given. Approved by Defendants O'Neal and McCauley.

10 June 2010 - SHU classification review with Defendants Tolbert, Washington, and Peckham. I asked Washington why she lied to my father on 7 June, telling him that I "absolutely get out of my cell every day" and perhaps I "was confused." Additionally, that I had several programs to occupy my time. Washington replied to me that her words were misconstrued and perhaps she should stop talking. She told me that I was a manipulator. A staff referral to Dr. Hyland still had not been filled out or sent by Defendants. They told me that I could have colored pencils in my cell, which I

9

Exh 13

**No. 6 CONT'D** already had, and that I would be getting pots of dirt and seeds soon. Defendant Peckham reminded me that once upon a time, solitary confinement was a dark room with nothing but a hole carved in the floor for human waste. I replied that the practice was inhumane and drove prisoners to insanity. Release denied. Approved by Defendants O'Neal and McCauley.

13 July 2010 - Wrote Defendant Buss to request being removed from SHU, since I was told it was his decision, and to take responsibility for my escape.

15 July 2010 - Wrote Defendant McCauley to express my gratitude for his efforts at programming and acknowledge his leadership.

26 July 2010 - SHU classification review with Defendants Washington and Talbert. She told me that I would be able to crochet. I told her that I needed to order a plastic crochet hook. She said that it had not been approved and she would check. (It was denied 31 Aug.) Release denied. Approved by Defendants O'Neal and Peckham.

4 August 2010 - Received reply from Defendant Knight in response to my letter to Buss. He said that IWP placed me in SHU which was in direct contradiction to what Defendants Washington, Talbert, and Peckham were telling me, which was that "downtown" or the Commissioner had kept me in administrative segregation in SHU. Defendant Knight said that it was up to the IWP Unit Team staff - (headed by Washington) - to determine that I was to be released and then forward it to Knight, apparently for approval.

10

5

Exh 13

NO. 6 CONT'D

19 August 2010 - SHU classification review with Defendants Tolbert and Washington. I told them about the letter from Defendant Knight saying that it was up to her to recommend my release and she replied "It is NOT my job." She said that no one would listen to anything she had to say because that decision came from people way above her. She suggested that I retain an attorney in order to get out of SHU. Washington asked if I felt that I was being mistreated. I replied that I was not being mistreated by the guards, but by the fact that I was locked in a room. Release denied. Approved by Defendant O'Neal.

9 September 2010 - SHU classification review with Defendants Tolbert and Washington. Washington said that she talked to Defendant McCauley about the letter from Defendant Knight and that they were not happy about it. I requested that she recommend my release from SHU. She again said that even if she did recommend my release, it wouldn't go anywhere, that no one will listen to her. She asked me why I think I should get out of SHU. I replied that I had not had any misconduct in 2 years, that I had been in SHU for twenty one (21) months, which was longer than other escapees, so I felt like I was being discriminated against. Washington replied that there's a man who spent five years in SHU for spitting on a guard. She asked what other escapees I was comparing myself to. I named Linda Darby, Reba Wilson, Lanikia Lewis, and Washington interrupted to say that Lewis was not charged with escape (although she was mistaken). Washington asked for me to outline the legal argument for discrimination. I asked her if it would be easier for her if the decision was forced by a judge. She answered yes, because no one wanted to recommend my release because if "anything were to happen" n I escape again, that person would lose their job. She again suggested that I retain an attorney.

Exh 13

**NO. 6 CONT'D**

I asked if it were her responsibility, would she release me, and she answered no. I asked why, and she replied, "I don't think that it has been long enough."

I said that I had already been punished for 21 months. "How long is long enough?" I asked.

She said, "I don't know. I'll have to think about it."

30 September 2010 - I wrote Defendant Knight asking him to clarify the chain of command and identify who is ultimately responsible for deciding to release me from SHU. I outlined the problem of finger-pointing and partial responsibility. I also sent him a copy of one of my SHU classification review sheets, which was typical each month, showing that the Basis for denying my release from SHU was always blank or unanswered, and I wanted an answer for why I was still in SHU. (I never received a reply)

14 October 2010 - SHU classification review with Defendants Peckham and Washington. I questioned both of them why each one would not recommend me to be released. Washington's answer was, "Because I think you'll escape again." When I asked her why she thought I wanted to escape, she replied, "Because you want to be free." I asked her why, when I have explicitly expressed that I don't want to escape again, and that I have had perfect behavior for nearly two years, what evidence did she base her opinion on. She said that she had "a gut feeling," and then told me that I have a problem with authority, because I ask too many questions.

Peckham told me that because officer Scott Spitler assisted me in escaping from Rockville, that I manipulated him and that his IWP staff was not ready for my intelligence.

12

**NO. 6 CONT'D**

I asked them "Can you put that on the paper?" They each wrote the basis on the SHU classification review sheet, which I used as a basis to grieve and appeal the situation. Defendant McCauley approved the denial of release, stating, "Threat to the safety and security of the facility."

15 October 2010 — The next day during his regular SHU walkthrough, I spoke with Defendant Peckham. I asked him why IDOC officials are so convinced that I want to escape again and he said that one of the Chicago cops said that I said that I would either escape again or kill myself. I told him that that conversation was reported out of context. A cop asked me about my escape and I told him the story of being set up for murder and losing faith in the justice system, and that in 2007, I had come to the point where I was planning to commit suicide. That's when I considered escaping. For me, it was either escape or die. I had been talking about the past, not the future, and that being a fugitive was trading one prison for another, and I would never do it again, because I had no idea how lonely life would be without my family and friends. Peckham responded that I can't change people's opinions, such as Defendant Washington's, and that I must convince those officials at the upper level.

Peckham said that I am at the top of the female eschelon of prisoners and that I have to wait until someone screws up bigger than me so that the focus is taken off of me, or somehow convince the upper levels of downtown officials that I am worthy to be released. I pointed out that since I had been in IWP SHU, three men had escaped, and one man beat an officer and held one hostage for 90 minutes. How did that not qualify as screwing up bigger than me? Peckham responded that that sort of behavior was expected out of men, not

**13**

Exh 13

| | |
|---|---|
| NO. 6 CONT'D | from women, and that's why my case is such a big deal. |

9 November 2010 - SHU classification review with Peckham and Washington. No meaningful dialogue. Release denied. Approved by Defendant O'Neal.

10 December 2010 - SHU classification review with Defendants Tolbert and Washington. Washington said that she did not believe I had taken responsibility for being a liar and manipulator. I was surprised and told her that absolutely, I take responsibility for the fact that I lied in order to escape and lied in order to stay free. However, I would not take responsibility for being a manipulator because I did not lie in trick Officer Spitler into helping me escape, that, in fact, he offered to help me. She said that she didn't believe me. I replied, "Have you asked him?" Release denied. Approved by Defendant O'Neal.

7

7 January 2011 - SHU classification review with Defendants Tolbert, Washington, and Peckham. I asked for them to issue a second blanket because Tolbert had instructed officer Clay to take my second blanket, and that the cold cell temperatures made it hard to sleep. Peckham said that he would check into it.

Peckham asked me for ideas for winter programs for SHU. I asked why, since they never actually implement any meaningful programs that I suggest, but I agreed to send him a list. He spoke of possible flower gardening in the spring. Release denied. Approved by Defendant O'Neal.

14

Exh 13

| NO. 6 CONT'D | 17 March 2011 - SHU Classification review with Defendants Tolbert and Washington. I told them that I understood that the Commissioner's Office has not been fair to them, specifically to Washington by putting her in charge of these SHU reviews but not giving her any power to decide. I asked Washington, "Who is responsible for letting me out?" Washington responded, "I really have no idea." I told her about my continuing mental health issues from being isolated and she acknowledged that being in SHU for so long would cause mental health issues. |
|---|---|
| | I asked why they thought that I was being treated differently, than other women who have escaped from IWP, a max security prison. Washington said that she did not know. Defendant Tolbert answered that she believes the difference in treatment stems from all of the negative publicity from my escape and how embarassing it was to the Commissioner and IDOC. Tolbert acknowledged how unfair it must seem for me to see other women found guilty of escape. (108A) to only spend 30 or 60 days in SHU and then leave, but that they were different because of where they had escaped from. |
| | I asked them for advice about what I could do, that I wasn't already doing, to prove that I am worthy to be released from SHU. Washington said I would have to convince them I am not an escape risk. I asked how could I do that if they never gave me any freedom? Tolbert stated that she had proposed that I be able to work on the SHU as a porter in order to get out of my room more and have more freedom, but she was told no. |
| | They both suggested that I write IWP officials with alternate proposals for my conditions of confinement, such as living on the special needs unit with no in-unit movement, or be moved |
| 15 | to the GRACE unit with special restrictions. |
| | Release denied. |

Exh 13

NO. 6
CONT'D

22 March 2011 - I wrote to Defendant McCauley to investigate whether he was responsible for deciding my classification to SHU or the conditions while on SHU, and if so, would he be open to suggestions about altering one or the other. I conveyed to him my exemplary behavior and ongoing mental health issues.

24 March 2011 - Defendant McCauley replied to my correspondence via letter. He did not answer whether he was responsible for my SHU classification or conditions, only that neither one would be altered. He cited that it was a "security risk," but gave no explanation

22 April 2011 - Peckham was served with complaint and summons.

25 April 2011 - Remaining Defendants served with complaint and summons via authorized DOC agent

16

Exh 13

NO. 7    Regarding Claim II in complaint:

1)   Defendants Peckham and McCauley created/approved a new mandatory lighting policy in December 2009 for SHU.

2)     Prior to this change, SHU prisoners, including Pardee, could control their own cell light from 5AM-11PM daily. Between 11PM-5AM, the cells were dark, illuminated only by hallway emergency lights shining through a small cell door window and outdoor lights shining through cell windows. Each SHU Officer had a flashlight to aid them during walkthroughs.

3)   When the IWP facility moved to its current location in November 2009, this same prisoner-controlled lighting policy continued in SHU at the direction of then-SHU supervisor Sgt. Biddie Johnson.

4)   In December 2009, Peckham and McCauley instituted a mandatory lighting policy, forcing the cell lights to be on from 5AM-11PM. Initially, Sgt. Johnson overrode this policy, maintaining that there was no need for mandatory lighting in SHU. Only one prisoner is housed in each cell and there is a 7-watt night light built into the overhead light that remains on 24 hours per day. Peckham and McCauley enforced this policy, anyhow.

5)   No event or emergency in SHU preceded this change in policy.

6)   In January 2011, Peckham and McCauley modified the facility, lighting policy so that general population prisoners could operate their own cell lights from 5AM-11PM. In SHU, lighting remained mandatory from 5AM-11PM.

7)   The lights in SHU are controlled by an officer not on SHU, so that our lights frequently remain on past 11PM, sometimes as late as midnight.

8)   In my grievance, I alleged that the lighting was being used discriminatorily against SHU prisoners as a covert method of punishment since mandatory lighting is only used in SHU which is where Peckham and McCauley send prisoners to be punished. Their response that the policy is a matter of safety and security is exaggerated, which is evidenced by the fact that while being able to see prisoners in their cells is a legitimate penological

17.

**NO. 7 CONT'D** interest, the need for 5AM-11PM lighting is belied by the fact that these are the hours during which the sun shines into our cell windows, and that during night hours (11PM-5AM), the officers sufficiently view us by the 7-watt overhead nightlight.

9) Constant illumination causes me sleep problems, including insomnia, anxiety, irritability, and other physical/psychological harm. The negative effects of excessive light are well documented by the scientific community, and have been recognized by the federal courts. Not only does it affect melanin levels that regulate sleep patterns and hormones associated with depression, but most recently, has been definitively linked to increased risk of breast cancer. The mandatory lighting policy causes me unnecessary harm, disrupts my daily life, and violates my right to adequate lighting.

_Regarding Claim I in complaint:_

10) Defendant Talbert became SHU supervisor in March 2010. At that time, IWP policy directed that SHU prisoners received seven (7) hours of out-of-cell recreation. Until March 2010, I consistently received seven hours each week.

11) In April 2010 there were days that I was not taken from my cell for recreation. On 6 May, I discussed this during a meeting with Ken Wiltsie, Internal Affairs IWP, and he said that he would address it at the next staff meeting with McCauley, Peckham, Washington, and Talbert.

12) On 12 May 2010, I wrote Defendant Talbert about having had only two (2) hours of out of cell recreation in six (6) days. She replied that she "looked into it"

18    13) On 13 May 2010, Carol Napier MSP told Defendants Talbert, Washington, and Peckham that the lack of out of cell recreation was causing sad

Exh 13

NO. 7 CONT'D   exacerbating my mental illness and I specifically needed more time out of my cell.

14) Recreation was not being offered seven hours/week for several reasons. Two areas were being used in SHU as recreation areas. A third room sat empty and could have been converted to recreation space easily, and cheaply, which I suggested more than once. Another excuse was short staffing. Policy requires two officers to be on the unit in order to move prisoners from their cells. When only one officer was assigned to SHU, during the hours that Defendant Tolbert worked, she approved recreation to be cancelled instead of supervising the few minutes of prisoner movement herself. Tolbert is a custody officer and was physically present on the unit.

15) After I grieved the lack of recreation, Tolbert helped design a schedule to micro-manage recreation hours, but it did not solve the problem. After my second grievance (December 2010), she revised the schedule, but it is inherently flawed so that when SHU is full or near full, recreation for all prisoners is often not possible to conduct even when SHU is adequately staffed.

16) Defendant Peckham approved the flawed schedules for recreation. Minor changes to this schedule would alleviate the inefficient use of officer's time on SHU.

17) Peckham is responsible for adequately staffing IWP housing units. He has the power to require mandatory overtime from staff when one shift falls short. Short staffing was often cited as the reason for recreation cancellation.

18) Defendant McCauley is responsible for directing the hiring, training and staffing of new employees when needed. McCauley knew that

19) short staffing in SHU was a problem, that it caused prisoner movement, including recreation, to be frozen in SHU, and that lack of out of cell

Exh 13

| | |
|---|---|
| NO. 7 CONT'D | recreation was part cause and catalyst for my mental illness issues. Short staffing was regarded as the excuse for inadequate recreation in my December 2010 grievance for the months May–Dec 2010. McCauley denied my requests for simple alterations to my conditions to rectify the problem. |
| 19) | The psychiatric effects of prolonged isolation, reduced environmental stimulation, and lack of exercise are well-documented and recognized by federal courts. The Indiana legislative body even made specific provisions to include in the Indiana Code a minimum 5 hours of out of cell recreation for segregated prisoners because of the numerous civil cases dealing with the issue. |

Regarding claim III

| | |
|---|---|
| 20) | On 6 May 2010, I met with Internal Affairs Investigator Ken Wiltsie to ask him for help, because I had experienced serious mental trauma on 2 May 2010, and did not know what to do. During this meeting, he discovered that I had not been getting out of my cell for recreation every day and agreed to address it at the next staff meeting with Defendants. |
| 21) | On 4 May 2010, Carol Naylor, MHP referred me to psychiatrist Dr. Hyland. On 13 May, Naylor voiced her concern about my mental health during a SHU classification meeting to the Defendants, Peckham, Washington, and Tolbert. Naylor attributed the cause of my deteriorating mental health to prolonged confinement in SHU, reduced stimulation, and not getting out of my room enough. Naylor specifically told them that I needed more freedom to physically move about, be out of my room, more autonomy, and in-cell stimulation to help me get better, and that I needed to see Dr. Hyland, the psychiatrist. |
| 22) | Defendants Peckham and Washington agreed to file a staff referral for mental health treatment to decrease the amount of time it would |

Exh 13

**0.7 CONT'D** have to wait to see Dr. Hyland. On 26 May, I saw Peckham, Washington, and Tolbert again and no referral had been made. They agreed to write one. On 10 June, I again met with Defendants. No referral was ever made.

23) On 11 June, I met with Dr. Hyland. She identified my mental break as being caused by "being locked in a room" for so long, and that the only thing she could do for me was to increase my psychotropic medication and instruct me to keep using my coping skills.

24) Carol Naylor continued to voice her concern for my mental health to Defendants in emails, staff meetings, and in person, and Defendants took little or no meaningful action. Some of the Defendants verbally dismissed her concerns, stating that I was "a manipulator."

25) Washington is responsible for housing unit programming and took no action in rectifying the recreation problem. Washington repeatedly recommended my continued SHU confinement in these same conditions, therefore performing actionable conduct.

25) Peckham routinely recommended or approved my continued SHU confinement in the same toxic conditions that were causing my mental illness, without taking action to change my conditions as recommended by mental health professionals Naylor and Hyland. Peckham approved inadequate schedules, denied my change of conditions requests, and maintained lighting that all contributed to a totality of conditions that further aggravated my illness.

26) McCauley denied my requests for in-cell stimulation activities such as arts/crafts, denied my requests for reduced isolation such as contact visits with my parents, additional recreation hour scheduling, and alternate unit confinement, and maintained SHU conditions that aggravated my illness. McCauley routinely approved my continued SHU confinement in these conditions each month, therefore performing actionable conduct.

27) The psychotropic medications prescribed by Dr. Hyland as a result of my

| 17 CONT'D | ongoing isolation and SHU conditions expose me to possible serious harm from the physical side effects of the medication. |
|---|---|

**Regarding Claim IV**

28) The duration of my confinement to SHU is highly atypical for any female prisoners in IDOC. My SHU confinement is indefinite and effectively precludes parole. IWP SHU conditions are the most restrictive in all female IDOC facilities. Example of Rockville Correctional Facility SHU conditions: Administrative segregation prisoners receive fourteen (14) hours of out of cell recreation, control their own lighting, have contact visits, and are unrestrained during on-unit movements. IWP general population conditions are much better than SHU conditions.

29) Indiana law limits prison officials' powers to segregate a prisoner by establishing substantive predicates and requiring periodic reviews of prisoners of any status in SHU. I have a liberty interest in avoiding SHU confinement and am entitled to due process.

30) Defendants Peckham, Washington, McCauley, O'Neal, Knight, and Buss have denied me due process. Peckham, Washington, McCauley and O'Neal each have regularly either recommended or approved continuing my SHU confinement, evidenced by their signatures on SHU classification reports. Defendant Knight identified himself as responsible in part in a letter dated 4 August 2010. Defendant Buss was identified as responsible in whole or part by various IWP officials.

31) The majority of reviews in 2009 were proforma exercises which consisted of nothing more than signatures on a form that indicated my SHU status would remain the same. No basis was recorded and the officer who conducted the so-called review, Sgt. Birdie Johnson, said that she was in no way responsible for determining my status of confinement. McCauley and O'Neal routinely approved these forms without explanation.

32) The majority of reviews conducted in 2010 were perfunctory in that

Exh 13

**1.7 CONT'D** Defendants Peckham, Washington, McCauley, and O'Neil gave me no notice, did not record the basis for their decisions, did not review relevant evidence, and it remains a mystery whether I have been or can be heard by the person charged with deciding my release from SHU confinement, or present my views to such a person.

33) My attempts to appeal to or be heard by Defendants Burn, Knight, or McCauley have resulted in boilerplate responses or no response at all.

34) Defendants' failures to provide me with due process has resulted in prolonged and indefinite SHU confinement which in turn has caused / exacerbated my mental illness and its effects.

Regarding Claim V

35) I allege that the group most similarly situated to me meriting similar treatment for the purpose of equal protection is that consisting of penal prisoners classified to an IDOC facility SHU.

36) Facility SHU classification hearings (see documents    ) consist of one or more person(s): The SHU supervisor, the Unit Team Manager, and/or a dorm counselor, and/or the Major. Defendant Washington is the Unit Team Manager at IWP, Defendant Peckham is the Major, and since my incarceration in IWP SHU (December 2008) the SHU supervisors have been Sgt. Birdie Johnson, Defendant Lt. Vanessa Talbert, and currently, Cpt. Wilkerson. Collectively referred to as the Review Board.

37) The Review Board meets with the prisoner, speaks about the prisoner's behavior, infraction, past sanctions, goals, plans, etc., and then deliberates among themselves to reach a consensus recommendation to either release or retain the prisoner in SHU. The prisoner is called back and informed of the Board's decision and future expectations of the prisoner. The classification hearing forms are forwarded to Defendant O'Neal for approval and then to Defendant McCauley

Exh 13

'9.7
CONT'D

who is the final decisionmaker. Almost without exception, the Board's recommendations are approved.

38) Both SHU Supervisors Johnson and Talbert have identified "Downtown" as responsible for determining my release. (Downtown refers to the IDOC offices located at 302 W. Washington, where the Commissioner and Regional Directors work.) When I have asked Ken Wiltsie of Internal Affairs who is responsible for keeping me in SHU, he has repeatedly told me it was the Commissioner. This was confirmed by Willard Plank, Chief of IDOC Internal Affairs on 30 December 2010. Defendant Knight in his 4 August 2010 letter, identified his office as being at least partly responsible.

39) Each month I have seen the Review Board, the decision to retain me in SHU is already pre-decided. Defendant Washington told me several times that it is not her job to recommend me for release. After I received Defendant Knight's letter of 4 August 2010 (see documents    ) identifying the Unit Team Manager as being responsible, Washington (the UTM) repeated that she was not responsible for recommending me to leave, and even if she did, no one would listen to her. When I asked her why no one was taking responsibility, she told me, "Because if we let you out [of SHU] and something happens, they are going to look back and see who signed that paper recommending to let you out, and guess who will get fired?" and then, "I need my job." In March 2010, I asked Washington who was responsible for letting me out of SHU, and she replied, "I honestly don't know."

40) When I receive my reviews, I get no notice, no relevant evidence is reviewed, no reasons are recorded for the basis of continuing my confinement, and I get no opportunity to present my views to the decisionmaker charged with releasing me. No clear, identifiable review and release process was created or communicated to me.

41) The prison procedures for appealing SHU classification allow only an appeal to the facility head, Defendant McCauley. No procedure exists

24

Exh 13

**2.7 con'td**

to appeal to the offices of Knight or Buss, because they do not typically involve themselves in the intrafacility SHU classifications. According to Ken Wiltsie, "Downtown" has directed conditions of my confinement in varying degrees since December 2008.

According to Talbert, Wiltsie, Peckham, and many other IWP staff, the reason that Defendant Buss and "Downtown" are involved in my SHU classification and conditions is because I escaped on Buss's first day in office (14 Aug 2008) and deeply embarrassed IDOC.

My 1,038 days in SHU is grossly disproportionate to any other female in IDOC's SHU's in recent history. The range of sanctions in SHU are 1-15 days for minor misconduct and up to 365 days for major misconduct, even escape offenses and violent acts.

Buss, Knight, McCauley, Peckham, O'Neal, and Washington violated my right to equal protection when they routinely approved my continued SHU confinement using an alternate process/review than that which is provided to other facility SHU female prisoners in IDOC. This process did not conform to normal prison practices, and by using it, the defendants willfully ignored my right to due process. The intent of their actions was to prolong my SHU confinement, which has resulted in physical and psychological harm.

I reiterate all facts set forth in paragraphs 1-27 in my original complaint.

**NO. 11**

Routine activities: take notes and study essays for syntax, vocabulary, and style, perform make-believe concerts for my mirror image (including air guitar), meditate, dancercise, write letters to family/friends, write my memoirs, edit them, listen to football games, sketch architectural designs of houses, ideas for farms, home improvements, make art for international art projects, write articles, edit articles, practice tai chi,

**2.5**

Exh 13

NO. 11
CONT'D

perform acupressure, do financial planning for family/friends, listen to National Public Radio shows, read spirituality and holistic articles, write submissions for creative writing contests, publications, construct my own collaborative art call sheets, create stationary, post motivational quotes and collages around my room, read and take notes on sexual abuse, civil law research, criminal law research, activist networking/media contacts, shower, eat, weed rocks, poke around in the dirt, make detailed happy faces with my uneaten food, practice letter writing in French, practice French verb drills, read other self-study books.

26

EXh 13

NO. 12 | Grievance(s) and Appeals filed in chronological order:

21 October 2010 — Filed classification appeal challenging the arbitrary process of my SHU classification reviews and denial of release; the insufficient basis for SHU confinement; asserting a discriminatory pretext for my SHU confinement.

26 October 2010 — Defendant McCauley denies appeal, responding, "Ms. Pinder's presence in general population is a threat to the safety and security of this facility." (He is the final reviewing authority)

5 November 2010 — Sent appeal to downtown classification authority. No response received.

5 November 2010 — Filed grievance for lack of out-of-cell hours.
22 November 2010 — Response that a consistent schedule would be implemented.

6 December 2010 — Again grieved lack of out-of-cell hours.
21 December 2010 — Response: "for reasons of the safety and security of the facility, recreation may be cancelled. Facility emergencies and staff shortages constitute such reasons.
22 December 2010 — Appealed to the final reviewing authority, downtown.
23 June 2010 — Response denying appeal.

23 January 2011 — Filed grievance about mandatory SHU lighting.
31 January 2011 — Response that lights will remain on.
17 February 2011 — Appealed to the final reviewing authority, downtown.
23 June 2011 — Response denying appeal.

27

Exh 13

I swear or affirm that the answers to the above and foregoing interrogatories are true and correct.

*Sarah Jo Pender   Sarah J Pender*
Sarah Pender
DOC # 953968

Subscribed and sworn to before me, a Notary Public, this __1st__ day of

__November_____, 2011.

*Frank L. Bryan*
Notary Public

Printed Name: FRANK L BRYAN

My Commission Expires:                    County of Residence:

NOVEMBER 1 2017                            HANCOCK

FRANK L. BRYAN
Hancock County
My Commission Expires
November 1, 2017

Respectfully Submitted,

Gregory F. Zoeller
Indiana Attorney General
Attorney No. 1958-98

By: *Wade Hornbacher*
Wade J. Hornbacher
Deputy Attorney General
Atty. No. 28605-76

Exh 13

CERTIFICATE OF SERVICE

I do hereby certify that a copy of Plaintiff's Answers to Defendants' First Interrogatories has been served on the following counsel of record by first-class, US mail, postage pre-paid, this 1st day of November, 2011.

Wade Hornbacher

302 West Washington St.

1GCS - 5th floor

Indpls, IN 46204

Sarah Jo Pender

SARAH JO PENDER

2596 N. GIRLS SCHOOL RD.

INDPLS, IN 46214

Exh 13

**IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

SARAH JO PENDER,                     )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )        CAUSE NO. 1:11-cv-511-TWP-MJD
                                     )
PETER PECKHAM, *et. al.*,            )
                                     )
                    Defendants.      )
                                     )

## DEFENDANTS' FIRST INTERROGATORIES TO PLAINTIFF

Defendants Ed Buss, Stanley Knight, Steve McCauley, Janet O'Neal, Peter Peckham, Vanessa Tolbert, and Shirley Washington, by counsel, Wade J. Hornbacher, Deputy Attorney General, propounds the following interrogatories to be answered by Plaintiff, Sarah Jo Pender, in the above-captioned matter. Furthermore, Defendants request that Plaintiff fully answer these interrogatories in writing and under oath, and that a signed verified copy of the answers be served upon counsel for Defendants within thirty (30) days after receipt of said interrogatories.

### DEFINITIONS

These interrogatories must be answered fully and under oath, within 33 days from the date on the certificate of service at the end of this document.

A copy of your answers must be sent to the Defendants' counsel at the following address, as well as on any other person who has appeared in this case:

Wade J. Hornbacher
Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204

Exh 13

Each question must be answered separately and in writing.  There is space following each interrogatory (question) and the answer should be within that space.  In the event that the answer will not fit within that space, use extra sheets of paper, attached at the end, note that the answer is continued on another page, and make sure that the continuation of the answer is identified by the number of the interrogatory being answered.

Your answers can be either typed or written by hand, as long as they can be read.  At the end of this set of questions is a signature line for the plaintiff and a place for the signature of a notary public.  The answers must be signed and there must be a notary signature and seal on the original answers.  If you have documents that contain the requested information, you can, if you want, attach copies and state "see attached documents" or some equal response **IN ADDITION TO** directly answering the interrogatory (question) in writing.

While the answers must be submitted within 33 days from the date on the certificate of service at the end of this document, if this time proves to be not enough, mail a letter to defendant's counsel Wade J. Hornbacher with an explanation of the reason that more time is needed and how much time is needed to complete and to mail the answers, and if the time is reasonable (no more than an additional 30 days from the original due date) and the reason for delay is legitimate, counsel will agree to the additional time without your having to ask the Court for that extra time and will send a letter to you informing you and so that you will have a written record of the agreement

For the purposes of these interrogatories, you and your means Plaintiff Sarah Pender.  All interrogatories shall be deemed continuing so as to require supplemental answers if further information is obtained between the time of service of the answers and the time of trial.  You are under a duty to seasonably amend your responses upon receipt of new, supplemental, or

Exh 13

supplanting information, and not to hold such information until the time of trial or settlement. You are required to answer as to all information available to you and to all persons acting on your behalf as your agent, representative, attorney, employee or investigator. State the source of your information, if other than yourself, giving names, titles, addresses and phone numbers of all persons relied upon and specific identification and location of records relied upon in answering these interrogatories.

**INTERROGATORY REQUESTS**

**INTERROGATORY NO. 1:**   State your full name, home address, date of birth, and social security number.

**ANSWER NO. 1:** Sarah Jo Pender   2596 North Girls School Road
Indianapolis, IN 46214

DOB - 05/29/1979
SS# - 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

**INTERROGATORY NO. 2:**   Identify all persons who witnessed, participated in, or otherwise have knowledge of the events described in Plaintiff's Complaint. Include the following:

a.      Name;

b.      DOC Number or Staff Position;

b.      Address;

c.      A description of the person's role in the events.

See attached answers, pages 1-5.

Exh 13

**INTERROGATORY NO. 3:**  Identify all incidents in which you have been charged with or convicted of a crime or had a true finding entered against you by a Juvenile Court?  Please state the charge, the circumstances that led to your arrest, the jurisdiction in which you were prosecuted, and the result of that prosecution.

**ANSWER NO. 3:**  In 1995, at age 16, I was convicted of theft, fraud, forgery, and auto theft resulting from a single incident when I ran away from home, taking my parent's car and credit card, then using said card. A similar incident occurred again, resulting in a conviction for driving without a license. I was sentenced to one year in Girls School and was released after 4 months for good behavior to 5 years of parole from which I was discharged 6 months later for good behavior. This all occurred in Marion County, IN.

**INTERROGATORY NO. 4:**  Have you ever been a party to a civil court proceeding in state or federal court? If so, please state the nature of the proceeding, the details of the case, your involvement in the case, and the outcome.

**ANSWER NO. 4:**  No.

**INTERROGATORY NO. 5:**  List all medical and/or mental health appointments/services you have had or received since your incarceration in chronological order, include:

    a.  The date,

    b.  The medical professionals seen on that date,

    c.  The nature of the visits, including the symptoms complained of,

Exh 13

    d.  Any diagnostic procedure or test performed,

    e.  The results of any tests,

    f.  Any diagnosis made,

    g.  Any treatment recommended, and

    h.  The efforts you made to comply with the recommended treatment.

**ANSWER NO. 5:**

*See attached answers, page 5, and attached document 131.*

**INTERROGATORY NO. 6:** Describe in detail and in chronological order, any conversation or correspondence you had with each Defendant.

    **ANSWER NO. 6:** *See attached answers, pages 6-16,*
    *and documents 1-6, 132-137.*

**INTERROGATORY NO. 7:** Identify, in separately numbered paragraphs, each action taken by each Defendant which you allege violated your constitutional rights. Cite directly to specific facts and evidence (not conclusion or supposition or belief) which you intend to use at trial to support your assertions.

    **ANSWER NO. 7:** *See attached pages 17-25, and documents 7-37, 40-41.*

Exh 13

<u>**INTERROGATORY NO. 8**</u>:  Have you given any statements, whether oral or in writing, regarding the events described in your Complaint?  If so, please state the date, to whom, and the custodian of each said statement.  (Note this request does not seek statements made to your attorney).

<u>**ANSWER NO. 8**</u>:  *No recorded / formal statements have been given.*

<u>**INTERROGATORY NO. 9**</u>:  Please list any and all statements known to you or your attorneys made by persons other than yourself regarding the events described in your Complaint, include the date of the statement, to whom it was made and the custodian of each statement made.

<u>**ANSWER NO. 9**</u>:  *Unknown.*

<u>**INTERROGATORY NO.10**</u>:  Describe in detail all physical, mental, and emotional symptoms you are currently experiencing or have experienced during your incarceration, for each symptom include:

Exh 13

a. When it was experienced, including if it is currently present,

b. Whether the symptom was present at any time before your incarceration,

c. The frequency with which the symptom is present, and the length of time it persists when

present, and

d. The impact the symptom has on your daily activities when present.

**ANSWER NO.10:** I have included my own notes taken from a daily log, but since the log was not kept for the purpose of recording the progression of my mental health, please see mental health records. I do not have these copies yet. When I get them, I will supplement this answer.

See documents 138-155.

**INTERROGATORY NO.11:** Describe, in detail, your daily routine, including all activities normally conducted.

**ANSWER NO.11:** Does "normally conducted" mean when no symptoms were present? My activities revolve around my mental and physical capacities at the time, and the complaint covers years of activity. My conditions, mental health, and medication have fluxuated. Attached is a list of activities in which I regularity engage. See pages 25-26.

**INTERROGATORY NO. 12:** Did you file a grievance concerning the incident that is the subject of your Complaint? If so, identify the date you filed, the response you received, and whether you pursued your grievance to the final reviewing authority.

**ANSWER NO. 12:** Yes. See attached page 27 and documents 156-175.

Exh 13