**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| SARAH JO PENDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-01287-TWP-DML |
| | ) |
| STEPHANIE PECKHAM, JAMES BASINGER, | ) |
| ED BUSS, STEVE MCCAULEY, JANET | ) |
| O'NEAL, LESLIE JOHNSON, SHIRLEY | ) |
| WASHINGTON, VANESSA TOLBERT, | ) |
| MICHAEL WILKERSON, STANLEY KNIGHT, | ) |
| MICHAEL OSBURN, and BRUCE LEMMON | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Stephanie Peckham, James Basinger, Ed Buss, Steve McCauley, Janet O'Neal, Leslie Johnson, Shirley Washington, Vanessa Tolbert, Michael Wilkerson, Stanley Knight, Michael Osburn and Bruce Lemmon (collectively, "the Defendants"). (Filing No. 92.) Plaintiff Sarah Jo Pender ("Pender"), a *pro se* litigant, is an inmate of the Indiana Department of Correction ("IDOC"). She brings this lawsuit pursuant to 42 U.S.C. § 1983, alleging the Defendants violated her constitutional rights when they confined her for over five years to the Special Housing Unit ("SHU") at the Indiana Women's Prison ("IWP"). Two types of claims survived the Defendants' Motion to Dismiss. (*See* Filing No. 47.) In Claim 2: Pender alleges the Defendants violated her Fourteenth Amendment due process rights when they failed to conduct meaningful reviews of her continued classification which resulted in her confinement for over five years in the SHU. In

Claims 1 and 4[1]: Pender alleges the Defendants violated her Eighth Amendment right to be free from cruel and unusual punishment after they were made aware of the harm to her mental health resulting from conditions in the SHU and took no steps to alleviate the harmful conditions. For reasons stated below, the Motion for Summary Judgment is **granted in part and denied in part**.[2]

## I.  LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."

---

[1] Pender has included two "Claim 3"s in her Complaint. (Filing No. 1 at 6 and 8.) The second Claim 3, starting on page 8 of the Complaint, is identified in this Entry as Claim 4.

[2] The Defendants move to strike Pender's brief and exhibits arguing that they are untimely-filed and that her brief exceeds the page limits set by this Court's rules. The request to strike is **denied**. First, the docket reflects that Pender's response to the motion for summary judgment was delayed because of a delay in responding to discovery by the Defendants. (*See* Filing No. 102.) Second, Pender's response is dated April 26, 2017, just one day past the deadline for filing her brief. The Court will apply the prison mailbox rule to Pender's filing, consider it to be filed on April 26, 2017, and in the interest of justice will consider it timely. *See Taylor v. Brown*, 787 F.3d 851, 858 (7th Cir. 2015). Next, the supplement to the exhibits docketed in this case on May 4, 2017, will not be stricken. There is no reason to believe that the late filing was the result of any intentional misconduct on Pender's part. Finally, in the interest of justice, the Court will also consider the entirety of Pender's brief.

*Hemsworth*, 476 F.3d at 490.  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

The Court notes that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

> However, it is also well established that pro se litigants are not excused from compliance with procedural rules.  [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.]  Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations and quotation marks omitted.)

## II.  STATEMENT OF FACTS

The following statement of facts are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Pender as the non-moving party.  *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

### A.    Segregated Housing within IDOC

There are two prisons which house adult female offenders within the IDOC, IWP and Rockville Correctional Facility.  At both facilities, offenders are either housed in the prison's general population, one of the segregation units, or another specially designated unit.  Broadly speaking, there are two types of segregation—disciplinary segregation and administrative

segregation.  A prisoner may be placed in disciplinary segregation for violating prison rules or IDOC rules. According to *The Use and Operation of Adult Disciplinary Segregation* manual, prisoners may be placed into disciplinary segregation units for a definite time period, as set out in Administrative Procedure 02-01-112.  In contrast, a prisoner may be placed in administrative segregation—even without committing any disciplinary offense—if the prisoner is considered a threat to self, others, property, or the security and/or orderly operation of the facility presented by the offender's presence in the general offender population. For example, a prisoner may be placed in administrative segregation for actions that may pose a risk of escape, other risks, having a history of extensive misbehavior, or being affiliated with a gang.  Prisoners may be placed in these units for an indefinite time period, subject to periodic administrative review pursuant to IDOC Administrative Procedure Policy 02-01-111. (Filing No. 94-2.)

**B.**   **Pender's 2008 Escape**

Prior to August 2008, Pender was incarcerated within the IDOC serving a 110-year sentence for murder.  On August 4, 2008, a male correctional officer assisted Pender in escaping from the Rockville Correctional Facility, a medium/maximum IDOC prison.  On December 20, 2008, Pender was recaptured in Chicago, Illinois.

On December 22, 2008, pending a formal conduct hearing, Pender was transported to the SHU at IWP.  Following her conduct hearing, Pender was sanctioned with a one-year disciplinary term in the SHU, to end on December 22, 2009.

**C.**   **End of Disciplinary Segregation and Confinement to Administrative Segregation**

In March 2009, Michael Osburn, the Executive Director of Adult Operations and Deputy Commissioner of Operations for the IDOC, drafted a memo proposing that Pender be placed in administrative segregation in the SHU when her disciplinary segregation term ends.  (Filing No.

105-36.) The memo was approved by Commissioner Ed Buss. *Id.*

While in administrative segregation at the SHU, Pender's out of cell exercise and stimulation ranged from one to four hours per week. (Filing No. 1 at 3). As a result, Pender's mental illness exacerbated, her cardiovascular health deteriorated, and she suffered headaches, lethargy, as well as self-harming anxiety. *Id.* In addition, the lighting policy for the SHU included 24-hour in-cell illumination which caused Pender transient insomnia, anxiety, sleep related appetite dysfunction, headaches and lethargy. *Id.*

In December 2009, Pender told Steve McCauley that she was having mental health problems and asked him if there were any alternatives to segregation. (Filing No. 105-13 at 7-8; Filing No. 105-16.) In May 2010, Pender asked Washington and Major Peckham to allow her to be seen by mental health staff. (Filing No. 105-69.) At that time, IDOC contracted with Corizon Correctional Healthcare ("Corizon") for the provision of medical services, including mental health services. Carol Naylor ("Naylor") was Pender's Behavioral Health Specialist and Dr. Julia K. Hyland, a Corizon employee or private contractor, was Pender's psychiatrist during the time period relevant to this lawsuit. Dr. Daniel Prober conducted "mental health status checks" on SHU prisoners.

Pender's medical records reflect that while she was in segregation, she was diagnosed with Axis I depressive disorder and she required treatment. (*See generally* Filing No. 107-2.) On May 27, 2010, Naylor noted that Pender:

> continues to appear depressed, crying. States she tries every coping skill she knows and it's not helping. Complained that she didn't have a chance to get out of her room today. I told her that Ms. [W]ashington (after the review meeting we had) was going to ask Dr. Prober to meet w/her.

*Id.* at 70. Pender's Mental Status Classification noted: "Psychiatric disorder that causes some functional impairment and requires frequent psychiatric and/or psychological services. These

services may be routine and/or unplanned in nature and may involve mental health monitoring." *Id.* at 11. In May 2010, Pender witnessed Naylor tell Peckham, Washington, and Tolbert that she had concerns about Pender's mental health.[3] (Filing No. 94-1 at 77.) Naylor requested a formal staff referral for a mental health evaluation and noted the same in Pender's medical records. *Id.;* (Filing No. 107-2 at 70.) On January 7, 2011, Naylor opined that Pender's "prolonged isolation . . . has something to do with" her mental health. *Id.* at 43. Pender's records from January 18, 2011, reflect the following Treatment Plan Review:

> Ofd. has been in SEG for 2 yrs. The isolation is starting to break her down, despite on-going counseling. She is very knowledgeable in self-help skills and has done very well to maintain stability. She has started engaging in self-stimulation, at time, self-injurious behaviors -- picking at her scalp until sores develop, same w/ her cuticles, she recently bit her arm (she is not finding this behavior to be soothing at all.) Lately we have been working on getting her anger out appropriately and that has helped decrease her anxiety.

*Id.* at 39. In a February 16, 2011 medical record regarding Pender, Peckham admitted to Naylor that "the stress of SQ is overwhelming her [Pender]. Has struggled with self-injurious and self-stimulating behaviors. Thinking about suicide as an option. Doesn't know when she might snap or what might trigger her. Scared that she is at the end of her rope." (Filing No. 105-25.)

Similarly, on May 28, 2011, a Mental Status Classification found that Pender suffered from a "[p]sychiatric disorder that causes some functional impairment and requires frequent psychiatric and/or psychological services. These services may be routine and/or unplanned in nature and may involve mental health monitoring." *Id.* at 11.

## D. Administrative Segregation Reviews

---

[3] The Defendants object to Pender's testimony regarding this event as hearsay. But hearsay is defined as a statement "offered[ed] . . . to prove the truth of the matter asserted in the statement." Federal Rule of Evidence 801. Here, the statement at issue is Naylor's statement to Peckham, Washington, and Tolbert that she had concerns about Pender's mental health. This statement is potentially objectionable as evidence regarding Pender's mental health, but is not objectionable regarding whether these Defendants were told about Pender's mental health. Accordingly, Defendants' objection is **overruled**.

1.    **Thirty-day Reviews**

IDOC policy provides that inmates housed in administrative segregation are to be reviewed for continued placement at least every thirty days.  The thirty-day review consists of examining the inmate's Case Plan and other documents related to behavior, conduct, and safety concerns, as well as reviewing any conduct reports and history.  The offender should be present and able to make comments, ask questions, and raise concerns.  IDOC Policy 02-01-111, which governs these reviews, further provides:  "In reviewing the need for the offender's continued assignment to administrative segregation, staff shall review the offender's Re-Entry Accountability Plan (RAP)[4] and other pertinent documentation." (Filing No. 94-3 at 12.) Classification Hearing Report instructions require a written rationale by the Classification Committee and the Supervisor of Classification.  (Filing No. 105-10.)

While housed in administrative segregation in the SHU, Pender was reviewed for continued placement at least every thirty days.  However, there is little in the record regarding the procedure for these reviews.  For the first four years she was in segregation, Pender did not have a Case Plan. In addition, the Defendants never entered a comment or goal in Pender's RAP.  The last RAP entry was made by Rockville Correctional Facility in 2008.  (*See* Filing No. 105-84.)

Pender describes her monthly reviews as "pro forma, perfunctory exercises."  (Filing No. 105 at 14.)  The Classification Hearing Reports for Pender's 30-day hearings are incomplete and do not include a basis for the recommendation that Pender remain in administrative segregation. (Filing No. 105-8.)  The procedure was never explained to Pender and she was not told how to receive information regarding why she was kept in segregation for so long, what she needed to do to get out of the SHU, or how to appeal.  (Filing No. 105-15.)

---

[4] The parties do not elaborate on the general content and purpose of the Case Plan or RAP.

2.    **Annual Reviews**

Annual reviews of segregation classification are also conducted.  With regard to annual

reviews, Indiana Code § 11-10-1-6 provides:

> The department shall, at least annually, review, in accord with sections 2 and 3 of
> this chapter, every committed offender not on parole to determine the
> appropriateness of his current classification and assignment and to make a
> classification-assignment decision based upon that review. Before making a
> classification-assignment decision the department shall interview the offender,
> discuss with him the information on which the decision will be based, and allow
> him to challenge that information and present pertinent information of his own. The
> department shall promptly notify the offender, in writing, of his classification-
> assignment decision and the reasons for it.

The form for Annual Reviews provides:

> In conjunction with this classification hearing, you have the following rights:
>
> 1. To appear in person.
>
> 2. To present pertinent information and to challenge information that will be used
> at the classification hearing.
>
> 3. To have all aspects of the classification discussed to include information that
> constitutes the basis of this classification hearing.
>
> 4. To be notified in writing of the results of the classification hearing.

(Filing No. 105 at 15.)

Generally, Pender was not given the information used to make classification decisions, and

she had no discussions with anyone about the basis or the results, and did not know how to appeal.

*Id.* Peckham and Washington, however, once explained to Pender that she remained in segregation

because they were not convinced that Pender was no longer an escape risk. (Filing No. 94-1 at 87-

91). When Pender followed the IDOC policy to appeal to decision-makers, she received no reply.

(Filing No. 105 at 15.)

E.    **Release from Segregation**

On January 31, 2014, after spending five years in segregation, Pender was moved from the SHU to a transitional dorm. She was later moved from the transitional dorm to the general prison population on June 14, 2014. Pender was not given the reasons for the change in her placement. Thereafter, on August 1, 2014, Pender filed a Complaint in this Court asserting Defendants violated her due process rights under the Fourteenth Amendment when improperly reviewing her confinement to the SHU, as well violated the Eighth Amendment when exhibiting deliberate indifference to her need for mental health treatment. (Filing No. 1.) Defendants move the Court for summary judgment, arguing Pender's due process rights were not violated; Pender cannot support a claim for deliberate indifference; and Defendants are entitled to qualified immunity. (Filing No. 92.)

F.    **The Individual Defendants**

**Ed Buss and Bruce Lemmon** each served as Commissioner of the IDOC during the time relevant to the lawsuit. Buss directed Knight to utilize established procedures to place Pender in the appropriate administrative or disciplinary segregation due to her escape. In particular, a February 15, 2009 email from Buss to McCauley, Knight, Osburn, and others states: "Please meet to discuss a special management plan that will communicate and prepare staff to supervise Sarah Today, six months from today and six years from now. The plan should include monitoring of phone calls, mail, and other communication . . ." (Filing No. 105-3.)

Buss approved the March 2009 plan to keep Pender in Administrative Segregation when the disciplinary segregation period ended. (Filing No. 105-36; 105-66.)

**James Basinger** is the Deputy Commissioner of Operations for IDOC. Pender states that she had a conversation with Basinger in March 2012 during which he told her he decides whether

someone gets out of segregation.  (Filing No. 105-12 at 7.)

     **Vanessa Tolbert** is a Correctional Lieutenant with IWP.  She participated in a number of Pender's 30-day or annual reviews.  Her responsibility in this process is providing information regarding the inmate's behavior during the review period.  (*See* Filing No. 105-3 at 25-27.)

     **Stephanie Peckham** (f/k/a Peter Peckham) was a Custody Supervisor and Correctional Major at IWP.  (Filing No. 105-3 at 17-20.)  Peckham sits as a member of a review panel that makes recommendations regarding the release of an inmate from segregation. Peckham participated in Pender's 30-day or annual reviews.

     **Shirley Washington** was a Unit Team Manager with IWP.  (Filing No. 93 at 5.)  Her duties included conducting segregation reviews and making recommendations to the Superintendent regarding whether inmates should remain in segregation. (Filing No. 105-3 at 20-22.) She participated in a number of Pender's classification reviews.

     **Michael Wilkerson** is a Correctional Captain with IWP.  Wilkerson also participated in Pender's classification reviews.

     **Steve McCauley** is the Superintendent of IWP.  Pursuant to IDOC Policy, 01-04-101, "Adult Offender Classification," "[t]he Superintendents are responsible for the operation of their respective facilities including the intra-facility classification and assignment of offenders." (Filing No. 105-10 at 7.)  As Superintendent, McCauley reviews segregation recommendations and makes final decisions on placement or removal from long term segregation, subject to review of the Executive Director of Adult Facilities. (Filing No. 105-3 at 12-17; Filing No. 105-10.)  McCauley reviewed Pender's appeals regarding her classification. (*See, e.g.*, Filing No. 105-42.)  McCauley also reviewed correspondence from Pender's family regarding her mental health. (Filing No. 105-61.)

**Janet O'Neal** is a Classification Supervisor at IWP.  Policy 01-04-101 provides that the Supervisor of Classification coordinates and supervises annual classification reviews.  *Id.* at 7-8. O'Neal participated in many of Pender's 30-day and annual classification reviews.

**Leslie Johnson** regularly participated in Pender's classification reviews.

**Stanley Knight** was the Executive Director of Adult Facilities for the IDOC.  In this role, he reviewed requests for placement into and releases from long-term departmental administrative segregation.  (Filing No. 105-3 at 7-10.)  Pender's father wrote to Knight concerning his concerns about her mental health.  (Filing No. 105-51.)

**Michael Osburn** was previously the Executive Director of Adult Operations Commissioner of Operations for IDOC. (Filing No. 105-3 at 10.)  He is now Inspector General and Public Safety Liaison for the IDOC, overseeing the IDOC's adult female facilities. (Filing No. 93 at 6.)  In March 2009, he proposed a special management plan that Pender would transition to administrative segregation at the conclusion of her disciplinary term in December of 2009.  (Filing No. 105-36.)  This plan was approved by Buss.  (Filing No. 105-68.)  Osburn reviewed letters from Pender's father regarding his concern for her mental health.  (Filing No. 105-62; Filing No. 105-51) (8/16/2010 R. Pender Ltr. "Her mental health has been deteriorating due to continued isolation.")

During her classification reviews, Tolbert, Wilkerson, Washington, Johnson, and Peckham repeatedly told Pender that the decision to keep her in segregation was made by someone else and referred to "Downtown" or "Central Office."  Pender assumed this meant the decisions were made by Commissioner's Buss and Lemmon. When Pender wrote to the Commissioner's office, she received vague answers regarding her classification decisions.

## III.  DISCUSSION

Pender contends the Defendants violated her due process rights in the course of her classification reviews and they were deliberately indifferent to her need for mental health in violation of her Eighth Amendment rights.  The Court will discuss each claim in turn.

### A.    Due Process

Defendants move for summary judgment arguing that Pender's rights under the Due Process Clause of the Fourteenth Amendment were not violated in the course of the reviews of her continued confinement in segregation.  The Due Process Clause applies only to deprivations of life, liberty, and property.  *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017).  In the context of segregation, "both the duration *and* the conditions of the segregation must be considered" in determining whether due process is implicated.  *Id.* (quoting *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (citation omitted)).  Defendants do not argue that the length and conditions of Pender's segregation did not implicate her due process rights; rather, they argue that the reviews she received satisfied due process.  *Cf. Marion*, 559 F.3d at 698 (240 days of segregation could be sufficiently long to implicate a cognizable liberty interest if the conditions of confinement were sufficiently severe).

When due process is implicated, the Supreme Court held in *Hewitt v. Helms*, that "[p]rison officials must engage in some sort of periodic review of the confinement of [inmates in administrative segregation]."  459 U.S. 460, 477 n. 9 (1983) (*abrogated on other grounds by Sandin*, 515 U.S. at 484).  "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements," but an inmate is entitled to "some informal, non-adversarial" procedures.  *Id.*; *Westefer v. Neal*, 682 F.3d 679, 684-85 (7th Cir. 2012). Informal due process under these circumstances requires a periodic review of the placement determination

12

at a frequency sufficient to ensure that "administrative segregation does not become 'a pretext for indefinite confinement.'" *Id.* (quoting *Hewitt*, 459 U.S. at 477 n.9). The law does not require a statement of reasons for an inmate's retention in segregation, but the review must still be meaningful and non-pretextual. *Isby*, 856 F.3d at 527. "'[A] meaningful review . . . is one that evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted.'" *Id.* (quoting *Toevs v. Reid,* 685 F.3d 903, 913-14 (10th Cir. 2012)).

The Second Circuit recently addressed a claim involving the continued confinement in segregation of an inmate who had previously attempted to escape and had a violent past. That court discussed the requirement of meaningful periodic reviews. *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017) (citing *Hewitt*, 459 U.S. at 477 n.9). The court stated "[i]t is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows. Review with a pre-ordained outcome is tantamount to no review at all." *Id.* The court went on to explain:

> reviews must take into account prison conditions and inmate behavior as they change over time; those changes may modify the calculus of whether the inmate presents a current threat to the safety of the facility. The periodic Ad Seg review test announced by the *Hewitt* Court is not whether the confined inmate *was* a threat to the facility when he was confined initially; it is whether the inmate "*remains* a security risk" on the date of the periodic review. *See* 459 U.S. at 477 n.9, 103 S.Ct. 864 (emphasis added). This is not to say that prison officials are barred from according significant weight to events that occurred in the past. Neither do we suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred long ago. We conclude merely that prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement. *See id.*

*Id.* at 611; *see also Kelly v. Brewer,* 525 F.2d 394, 400 (8th Cir. 1975) (reason for segregation must

not only be valid at outset but must continue to subsist during period of segregation).

Here, there is little evidence in the record regarding the substance of Pender's classification reviews. The Classification Review Reports are for the most part blank. In addition, Pender asserts that she was often not told the reason for her continued confinement in segregation and when she was told, she was told only that those reviewing her classification were "not convinced" that she was not still an escape risk.

The Defendants argue that the determination that Pender was "an ongoing escape risk was not unreasonable given the circumstances surrounding her prior escape from custody . . ." (Filing No. 93 at 10.) The Court notes, however, the question of whether or not due process was satisfied does not depend on whether the conclusion was reasonable, but whether the review was meaningful. *See Isby*, 856 F.3d at 527. Pender contends that the review was not meaningful, pointing to the blank Review Report forms and Defendants failure to provide her with an adequate reason for her continued placement in segregation. Based on this evidence, a reasonable jury could conclude that Pender's continued placement in segregation was based only on her previous escape, rather than any consideration of the continued appropriateness of segregation. Accordingly, the Court finds that a material issue of fact remains regarding whether Pender's segregation reviews were meaningful as required by due process.

The Defendants also argue that they are entitled to qualified immunity on Pender's claims. The Court finds, however, as the *Isby* court explained, "prison officials have been on notice since *Hewitt* that periodic reviews of administrative segregation are constitutionally required, and it is self-evident that they cannot be sham." 856 F.3d at 530. For this reason, the Seventh Circuit rejected the qualified immunity defense, as does this Court.

In sum, because there is a genuine issue of material fact regarding whether the Defendants

14

provided Pender with meaningful review of her continued confinement in the SHU, summary judgment is **denied** as to all Defendants on Pender's due process claims.

**B.    <u>Eighth Amendment Deliberate Indifference</u>**

The Defendants also move for summary judgment on Pender's Eighth Amendment claim. To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) she suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster*, 658 F.3d 742, 750-51 (7th Cir. 2011).

**1.    <u>Serious Mental Illness</u>**

The Defendants argue that Pender cannot show that she had a "serious mental illness" that was caused by the conditions of her confinement. The Court disagrees and notes that Pender's medical records reflect that she was diagnosed with depressive disorder and classified as suffering from a "[p]sychiatric disorder that causes some functional impairment and requires frequent psychiatric and/or psychological services." (Filing No. 107-2 at 11.) Her therapist, Naylor, noted on several occasions her belief that Pender's self-injurious behaviors and deteriorating condition was a result of "prolonged isolation." In addition, Pender's treatment provider's frequently opined that her mental health problems exacerbated due to her confinement in segregation. (*See* Filing No. 107-2 at 33, 39.)

Based on this evidence, regardless of whether a doctor specifically diagnosed her with a "serious mental illness," a reasonable jury could find that Pender's mental health problems amount to a serious medical condition caused by her time in segregation. *See Pyles v. Fahim,* 771 F.3d

403, 409 (7th Cir. 2014) ("A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, *or the need for treatment would be obvious to a layperson*.") (emphasis added); *Rice ex rel. Rice v. Correctional Medical Services,* 675 F.3d 650, 676 (7th Cir. 2012) (holding that prison officials have an obligation to provide for the psychiatric care of their inmates pursuant to their constitutional obligation to address their serious medical needs) (citing *Sanville v. McCaughtry,* 266 F.3d 724, 734 (7th Cir. 2001)); *see also Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015) (reminding "both prison officials and judges to be alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison, especially the kind of nonviolent misbehavior involved in the present case"); *Glossip v. Gross*, 135 S.Ct. 2726, 2765 (2015) (J. Breyer, dissenting) ( "it is well documented that . . . prolonged solitary confinement produces numerous deleterious harms."); *Davis v. Ayala,* 135 S.Ct. 2187, 2209-10 (2015) (Kennedy, J., concurring) ("The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. . . , research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

The Defendants' arguments that Pender did not suffer from a serious mental illness as a result of her time in segregation are therefore rejected.

### 2.    **Disregard of the Risk**

The Defendants also argue that Pender failed to show that they were aware of her medical health issues and deliberately ignored them.   "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner," *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*,

394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)).

There is evidence in the record that Peckham, Washington, and Tolbert were aware that Pender's mental health was deteriorating. Pender asked Peckham and Washington to assist her in obtaining mental health services, as well as informed McCauley that she was having mental health problems. The Court also notes that Pender's father wrote to both Knight and Osburn to express his concern regarding Pender's mental health, however, there is no evidence that these Defendants took any action based on these warnings. Accordingly, the Court finds that a reasonable jury could conclude that Peckham, Washington, Tolbert, McCauley, Knight and Osburn were aware of Pender's mental illness and took no action to assist her.

Defendants argue, even if they were aware of Pender's mental illness and took no action themselves, they were not deliberately indifferent because they were entitled to rely on the work of medical professionals treating her. Generally, officials are entitled to defer to the judgment of medical professionals regarding the care of inmates in their custody. *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011); *Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir. 2006); *Brownell v. Figel,* 950 F.2d 1285, 1291-92 (7th Cir. 1991). The Court finds, however, that Defendants' argument is without merit because Pender's health professionals specifically alerted Peckham, Washington, Tolbert, McCauley, Knight and Osburn to Pender's condition and sought their intervention.

Pender also argues, because Peckham, Washington, and Tolbert followed IDOC policy and conveyed the content of her segregation reviews to O'Neal and other Defendants, those Defendants are also liable for deliberate indifference to her mental health problems. The Court, however, notes that there is no evidence that these other Defendants had any specific knowledge of the risk to

Pender's mental health.  Accordingly, all Defendants, other than Peckham, Washington, Tolbert, McCauley, Knight and Osburn are entitled to summary judgment on the claim that they were deliberately indifferent to Pender's mental health needs.

### 3.    Qualified Immunity

Finally, the Defendants argue generally that they are entitled to qualified immunity on Pender's claims regarding deliberate indifference to mental health.  To defeat a properly raised qualified immunity defense, the plaintiff must establish two things: (1) that the facts alleged describe a violation of a protected right; and (2) that this right was clearly established at the time of the defendant's alleged misconduct.  *Gerhartz v. Richert*, 779 F.3d 682, 688 (7th Cir. 2015).  A court may answer the questions in either order, and need not answer both if one proves to be dispositive.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In order to determine from case law whether a constitutional right was clearly established, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

The Court addresses the second element of qualified immunity – whether the right at issue was clearly established at the time of the alleged misconduct – first.  While the Court has not found a case specifically related to the mental health of inmates in segregation, it is clearly established that mental illness is a serious medical illness.  *See Rice*, 675 F.3d 650 at 676 (citing *Sanville*, 266 F.3d at 734).  It is also clearly established that prison officials may not turn a blind eye to an inmate in distress.  *See Arnett,* 658 F.3d at 755–56 ("nonmedical officials can 'be chargeable with ... deliberate indifference' where they have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'") (quoting *Hayes v. Snyder,* 546 F.3d 516, 525 (7th Cir. 2008)).  Based on these cases, the Court finds that Pender's right to be

free from the Defendants' deliberate indifference to her mental health needs was clearly established.

With regard to the first element of qualified immunity – whether the facts alleged identify a violation of the right at issue – the Court has already found that there is a genuine issue of material fact regarding whether Defendants Peckham, Washington, Tolbert, McCauley, Knight and Osburn violated Pender's rights through their deliberate indifference to her mental health needs. As the Court has already explained, the evidence reflects that several individuals, including Naylor, the professional who was treating her, informed Defendants Peckham, Washington, Tolbert, and McCauley of Pender's mental health deterioration and asked for their assistance but they did not act on these requests. A reasonable jury could conclude from this evidence that these Defendants were aware of a risk to Pender's mental health despite the treatment she was receiving and failed to respond to that risk. Such behavior, if proven, amounts to deliberate indifference. These Defendants are therefore not entitled to summary judgment based on qualified immunity.

## IV.  CONCLUSION

Pender was confined to the SHU for 1,866 days and her prolonged segregation in the SHU caused persistent and at times serious mental illness, painful emotional distress and physical harm for which she sought medical treatment from health care providers. It is no stretch of logic to conclude, under the facts in this case, that a person spending five years in segregation might suffer from mental illness. There is a genuine issue of material fact regarding whether Defendants provided Pender with meaningful review of her continued confinement in the SHU; and on Pender's Eighth Amendment claim of deliberate indifference to her mental health needs. For the reasons stated above, the Defendants' Motion for Summary Judgment (Filing No. 92), is **GRANTED in part AND DENIED in part.** Summary judgment is **DENIED** as to all Defendants

on Pender's due process claim. Defendants James Basinger, Ed Buss, Janet O'Neal, Leslie Johnson, Michael Wilkerson and Bruce Lemmon are **GRANTED** summary judgment on Pender's Eighth Amendment claim. Summary judgment is **DENIED** as to Defendants Stephanie Peckham, Shirley Washington, Vanessa Tolbert, Steve McCauley, Stanley Knight, and Michael Osburn on Pender's Eighth Amendment claim.

Accordingly, the due process claims against all defendants, as well as the Eighth Amendment claims against Washington, Tolbert, McCauley, Knight, and Osburn will proceed. Further proceedings, including a settlement conference and a trial will be scheduled in a separate order. If Pender requests the assistance of counsel with these further proceedings, she must file a motion on the Court's form. The **Clerk shall include a form** with Pender's copy of this Entry.

**SO ORDERED.**

Date: 7/17/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Sarah Jo Pender, #953968
Indiana Women's Prison
2529 North Girls School Road
Indianapolis, Indiana 46214

Dennis E. Mullen
OFFICE OF THE INDIANA ATTORNEY GENERAL
dennis.mullen@atg.in.gov

Jonathan Paul Nagy
OFFICE OF THE INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

Kyle Charles Fletcher
OFFICE OF THE INDIANA ATTORNEY GENERAL
kyle.fletcher@atg.in.gov

Matthew Keith Phillips
OFFICE OF THE INDIANA ATTORNEY GENERAL
matthew.phillips@atg.in.gov